# IN THE SUPREME COURT OF TEXAS

══════════
No. 18-0426
══════════

WILLIAM A. BREWER III, PETITIONER,

V.

LENNOX HEARTH PRODUCTS, LLC; TURNER & WITT PLUMBING, INC.; STRONG
CUSTOM BUILDERS, LLC; THERMO DYNAMIC INSULATION, LLC; STATE FARM
LLOYDS INSURANCE COMPANY; KEN AND BECKY TEEL; ROSS AND MEG RUSHING,
RESPONDENTS

══════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SEVENTH DISTRICT
══════════════════════════════════════

**Argued October 10, 2019**

JUSTICE GUZMAN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT,
JUSTICE GREEN, JUSTICE LEHRMANN, JUSTICE DEVINE, JUSTICE BLACKLOCK, and JUSTICE BUSBY
joined.

JUSTICE BOYD filed an opinion concurring in part and dissenting in part.

JUSTICE BLAND did not participate in the decision.

Lawyers are under a professional obligation to act with commitment and dedication to their

clients' interests, but they are neither duty-bound nor permitted to press for every possible advantage

under the imprimatur of zealous advocacy.[1]    The discretion to determine the trial tactics and

───────────────

[1] *Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 367 (Tex. 2014).

litigation strategies to employ, while considerable, is cabined by ethical standards memorialized in sundry rules and statutes and is subject to the inherent authority of courts to preserve the integrity of our judicial system.[2]

In this products-liability and wrongful-death suit, the trial court sanctioned an attorney for commissioning a pretrial survey that commenced in the county of suit shortly before trial. No rule, statute, or applicable court order categorically prohibited or specifically constrained the use of a pretrial survey in this case or otherwise, and as far as we can discern, this is the only reported case imposing sanctions on a lawyer for conducting such a survey. We hold that the sanctions order, issued under the court's inherent authority, cannot stand because evidence of bad faith is lacking. Inherent authority has been likened to an "imperial"[3] power with intrinsic "potency" that necessitates "restraint," "discretion," and "great caution";[4] accordingly, sanctions issued pursuant to a court's inherent powers are permissible only to the extent necessary to deter, alleviate, and counteract bad-faith abuse of the judicial process.[5] Certain attributes of the pretrial survey may have been

---

[2] *See* TEX. CIV. PRAC. & REM. CODE §§ 9.001–.014; 10.001–.006 (sanctions for frivolous pleadings and motions); TEX. GOV'T CODE § 21.002 (statutory contempt power); *In re Bennett*, 960 S.W.2d 35, 40 (Tex. 1997) ("Courts possess inherent power to discipline an attorney's behavior."); *Remington Arms Co., Inc. v. Caldwell*, 850 S.W.2d 167, 172 (Tex. 1993) (observing courts have inherent and statutory contempt power); TEX. R. CIV. P. 13 (sanctions for groundless and bad faith or harassing court filings), 18a(h) (sanctions for groundless and bad faith or harassing recusal motion), 215 (sanctions for discovery abuses); TEX. DISCIPLINARY RULES PROF'L CONDUCT, *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G, app. A [TEX. DISCIPLINARY RULES PROF'L CONDUCT]; TEX. CODE JUD. CONDUCT, CANON 3(d)(2), *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G, app. B (disciplinary responsibilities of judges).

[3] *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 702 (5th Cir. 1990) (observing that inherent power "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function").

[4] *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-44 (1991).

[5] *See, e.g.*, *Onwuteaka v. Gill*, 908 S.W.2d 276, 280 (Tex. App.—Houston [1st Dist.] 1995, no writ) ("A trial court has inherent power to sanction bad faith conduct during the course of litigation that interferes with administration of justice or the preservation of the court's dignity and integrity."); *see also Chambers*, 501 U.S. at 48-49 (attorney's fees awarded as a sanction under the court's inherent authority must be causally connected to bad faith conduct).

2

reasonably disconcerting to the trial court, but the record bears no evidence of bad faith in the attorney's choice to conduct a pretrial survey or in the manner and means of its execution. We therefore vacate the sanctions order.

## I. Background

The underlying products-liability and wrongful-death suit settled on the eve of trial amid a host of pending motions seeking sanctions against the product manufacturer's trial counsel, William H. Brewer III and his law firm, Bickel & Brewer (collectively, Brewer).[6] The sanctions motions complained that Brewer and his firm had improperly commissioned a telephone survey to be conducted in the county of suit mere weeks before the scheduled jury trial without ensuring witnesses, represented parties, judges, and court personnel were excluded from the survey database and without voluntarily disclosing the survey to the trial court or the litigants. The movants characterized the survey as a "push poll" that was designed to influence or change public opinion and taint the jury pool rather than a legitimate effort to conduct community-attitude research.[7] In

---

[6] While the sanctions motions were pending, the law firm changed its name to Brewer, Attorneys & Counselors.

[7] The parties have not identified a universal or generally accepted definition of a "push poll" other than describing it as a method of polling that seeks to influence or persuade rather than to legitimately conduct research. In 1995, the National Council on Public Polls issued a warning about push polls, describing them as a telephone campaign "used to canvass vast numbers of potential voters, feeding them false and damaging 'information' . . . under the guise of taking a poll to see how this 'information' effects [sic] voter preferences" without a genuine "intent to conduct research." *A Press WARNING from the National Council on Public Polls*, NATIONAL COUNCIL ON PUBLIC POLLS (May 22, 1995), http://www ncpp.org/drupal57/files/Push%20Polls.pdf. In 2007, the American Association for Public Opinion Research (AAPOR) published a clarification defining a "push poll" as telephone "calls disguised as research that are designed to persuade large numbers of voters—not to measure opinion." *AAPOR Provides Clarification on "Push Poll" Issue*, AMERICAN ASSOCIATION FOR PUBLIC OPINION RESEARCH, (Nov. 16, 2007), https://www.aapor.org/Publications-Media/Press-Releases/Archived-Press-Releases/AAPOR-Provides-Clarification-on-Push-Poll-Issue.aspx. According to AAPOR's guidance, push polls usually employ few questions that are either uniformly negative or uniformly positive, large numbers of people are contacted, and the identity of the organization conducting the poll is either undisclosed or fraudulent. *Id.*

3

addition to compensatory sanctions, the movants requested total forfeiture of all fees the manufacturer had paid to Bickel & Brewer for the litigation.

The tragic facts and allegations in the underlying lawsuit set the context for the telephone survey and the trial court's sanction order. Suit was filed shortly after a residential home in the City of Lubbock caught fire during a lightning storm in August 2012. The fire ignited gas seeping from pipes that had been perforated by lightning-induced electrical arcs. The ensuing explosion resulted in the death of a house guest by thermal insult and significant personal-injury and property losses to the homeowners. The following month, the City of Lubbock issued a moratorium on the use of yellow-jacketed corrugated stainless steel tubing (CSST), the type of gas plumbing pipe used in the home's construction.

Within weeks, the homeowners and the decedent's parents sued the CSST manufacturer, the pipe supply company, and the pipe installer. Among other allegations, the plaintiffs asserted the CSST product used in the home's construction was defectively designed because it was too thin to withstand the effects of a lightning strike; the plumbing company was negligent in selecting and installing a defective product, but had installed the CSST in accordance with the manufacturer's instructions; and the pipe supplier was negligent in selling a product known in the industry to be prone to failure in lightning events.

After answering with a general denial, the pipe manufacturer, Titeflex Corporation, filed third-party claims against (1) the installer of the spray-foam insulation in the attic, (2) the home builder, and (3) the manufacturer of the fireplace that had been installed in the home. Titeflex's litigation position was that CSST is safe when properly installed and that other conditions, including improper installation, caused or contributed to the explosion. To that end, Titeflex disputed a

4

determination by the City's fire marshal and chief building inspector that the CSST piping in the homeowner's residence had been installed properly even though it was in contact with electrical wires.

Trial was eventually scheduled to commence in June 2014, and the subject telephone survey was conducted on Titeflex's behalf in late May of that year. Several noteworthy events occurred in advance of the survey.

In December 2013, the City extended the moratorium to include a CSST product not involved in this litigation (black-jacketed CSST); the media covered both the initial and expanded moratoriums; and one of the plaintiffs' attorneys provided a responsive comment in at least one televised news story. Plaintiffs' counsel also:

- set up a website touting the dangers of CSST piping;[8]

- conducted a telephone poll to gauge the community's familiarity with CSST products and whether those products were used in the survey respondents' homes;[9] and

- hosted Lubbock's assistant fire marshal, Bob Bailey, and chief building official, Steve O'Neal, on a trip to Massachusetts to view a demonstration involving CSST lightning impacts, which the Lightning Institute conducted shortly before the City announced the expanded moratorium.[10]

Titeflex viewed these events as detrimental to its business and as negatively impacting its litigation strategy.

---

[8] The plaintiffs' website included pretrial discovery; unauthenticated statements, pictures, and videos; and references to other litigation involving Titeflex. Plaintiff's counsel publicized this website to several regulatory bodies, including the National Fire Protection Association and the Texas House of Representatives, in connection with efforts seeking further bans on use of CSST.

[9] The plaintiffs disclosed the existence of that poll to the other parties and the trial court no later than two months before trial.

[10] During the same time period, the City of Lubbock's municipal board had invited Titeflex to submit its own testing results, but Titeflex evidently declined to do so because of confidentiality concerns.

5

A few months before the December 2013 moratorium expansion, Brewer and his law firm joined Titeflex's litigation team. According to Brewer, the moratoriums, extensive press coverage, and plaintiffs' counsel's media activities impelled the law firm to commission a pretrial survey to gauge community attitudes toward Titeflex's legal position and defensive theories. Travis Carter, Bickel & Brewer's director of community and media relations, spearheaded the survey project for the law firm. Carter selected Public Opinion Strategies, a nationally recognized public opinion research firm, to develop and conduct "a random independent poll in regard to certain attitudes and opinions that would likely be prevalent among homeowners in Lubbock, Texas." According to Brewer and his staff, the scope of the poll was to include community attitudes and opinions about CSST, the moratoriums, and potential litigation themes.

Public Opinion Strategies was tasked with drafting the survey questions, and to assist with that endeavor, Carter gave the survey company a background sheet on CSST that he had prepared along with links to state and national media coverage and newspaper articles reporting on the explosion and moratoriums. After receiving a draft of the survey from Public Opinion Strategies, Carter edited the survey to add questions adverse to Titeflex's litigation position "to balance the poll" and ensure "there were statements in there that were both favorable toward and opposed to the view of the Defendants." Brewer reviewed the revised draft, suggested some tweaks, and gave the go-ahead to move forward. The final version of the survey, which is attached as Appendix A, was composed of 42 questions, more than a third of which were introductory and demographic questions. Some questions presented information in a static order while others were randomized to prevent order bias. The second half of the survey specifically referenced this lawsuit in connection with questions testing litigation themes.

Public Opinion Strategies recommended producing either 300 or 500 completed surveys, and Brewer and Carter chose the lesser. The only client-selected parameters for the survey respondents was that all participants be Lubbock County residents over the age of 18. To ensure the completion of 300 surveys, Public Opinion Strategies procured a database of contact information for 20,000 individuals meeting that criteria from a third-party vendor, i360. Public Opinion Strategies then provided the survey questions to another third-party vendor, Survey Sampling International (SSI), to conduct the survey using the database i360 had compiled. SSI, a consumer research firm, conducted the approved survey on May 21 and 22 using computer-assisted telephone interviewing (CATI). CATI is a telephone surveying technique in which the interviewer follows a script guided by a software application that randomly selects respondents from the survey database.

Brewer did not inform the court or the other parties about the survey before, during, or after the May 21 and 22 survey period, but no discovery request, rule, statute, or court order required him to do so. The plaintiffs' attorneys nonetheless caught wind of the survey efforts and, several days after it was completed, began making inquiries to the other parties to determine the source. When asked about a telephone poll being conducted by a company called SSI, Brewer disclaimed knowledge. Other Titeflex legal representatives did the same. Days later, Brewer informed counsel for all parties that he had commissioned the telephone survey. At that time, and depending on which side is recounting the events, Brewer either confessed or made the connection between Public Opinion Strategies (which he had hired) and SSI (which he had not).

The plaintiffs immediately requested a protective order and sought sanctions against Titeflex, Brewer, and Brewer's law firm. The other parties followed suit. The movants alleged the pretrial survey was sanctionable because (1) the content of the poll was designed to intimidate witnesses and

7

tamper with the jury pool and (2) the survey violated disciplinary rules constraining pretrial publicity and contact with represented parties and jury pool members.[11] The sanctions motions described the survey as an "overt attempt to convince [survey respondents] who [was] to blame for CSST failures in homes, in and around Lubbock, Texas."

With the trial date looming, the trial court initially heard evidence and argument related to the sanctions motions over the course of three days in early June. Titeflex produced evidence that it was in the dark about the survey, which created a conflict of interest with Brewer's continued representation. Titeflex discharged Brewer days before the trial setting, and the case settled the weekend before trial. A jury venire was never empaneled.

A four-day sanctions hearing was later scheduled to take place in September. Brewer was informally notified about the hearing about a month prior. Shortly thereafter, the parties filed amended sanctions motions focusing on Brewer and his law firm and dropping complaints about Titeflex. Brewer requested a continuance, citing lack of proper notice, the necessity of obtaining discovery from Public Opinion Strategies and its third-party vendors, and the recently filed amended motions. The trial court denied Brewer's motion.

All told, the trial court heard argument and evidence about the telephone survey over the course of seven days in June, September, and October 2014, including one full day when Brewer was in the hot seat under questioning from lawyers for five adverse parties. Uncontroverted testimony at the sanctions hearings established that no one at Brewer's firm had contact with or prior

---

[11] *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.06 ("Maintaining Integrity of Jury System"), 3.07 ("Trial Publicity"), 4.02 ("Communication with One Represented by Counsel"); *see also* TEX. PENAL CODE § 36.06(a)(l)(A) (intentionally or knowingly harming or threatening to harm another by an unlawful act in retaliation for or on account of the service or status of another as a public servant, witness, or prospective witness is a criminal offense).

knowledge of i360's or SSI's involvement in the survey. Moreover, no one at Bickel & Brewer had any input in selecting any name or phone number included in the survey database. Nor did anyone provide a list to Public Opinion Strategies or the third-party vendors identifying people to exclude from the database due to their association with or participation in the ongoing litigation.

According to the hearing testimony, Public Opinion Strategies took the laboring oar in drafting the survey questions. Carter materially contributed to the survey's contents, but his edits added questions unfavorable to Titeflex's position to help ensure the survey "was not in any way biased against one party or the other." Brewer's actual participation in developing the survey was described as minimal, and those knowledgeable about the survey's procurement repeatedly stressed that it was randomly administered by third-party professionals and intentionally balanced to both favor and disfavor Titeflex so opinions and attitudes about CSST and Titeflex's legal messages could be tested.

Expert testimony was a mixed bag. An attorney offered as an expert on ethical standards testified the survey was inconsistent with the Texas Disciplinary Rules of Professional Conduct because the survey might influence a person who could potentially end up in the venire and be seated on a jury if the survey's existence was undisclosed and the juror's participation in it was not elicited in voir dire questioning. Disciplinary Rule 3.06(a) prohibits attorneys from "seek[ing] to influence a venireman or juror concerning the merits of a pending matter *by means prohibited by law or applicable rules of practice or procedure*."[12] That prohibition extends to relatives of jurors

_____

[12] TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.06(a)(2) (emphasis added).

and members of the venire.[13] The expert did not identify any rule or law that prohibits a pretrial survey or contact with community members merely because they could conceivably end up in the venire.

However, the expert opined that Brewer inadequately supervised the independent contractors conducting the survey by not ensuring witnesses and represented parties connected with the litigation were excluded from the survey database. Disciplinary Rule 4.02 prohibits lawyers from communicating with a represented party about the subject of the litigation without the consent of the represented party's counsel, except as authorized by law.[14] And a lawyer having direct supervisory authority over a nonlawyer has a duty to make "reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer."[15] A supervisory lawyer may be subject to discipline by the State Bar if "the lawyer orders, encourages, or permits the conduct involved" or "with knowledge of such misconduct" "knowingly" fails to take reasonable remedial or mitigating measures.[16]

Brewer's and Carter's testimony that they had no hand in assembling the survey database was unrefuted, and Brewer took the position that securing a third-party professional to design and implement the survey was a reasonable effort to ensure it was conducted appropriately. He acknowledged, however, that not taking a more active role in providing limiting parameters was a lapse of judgment.

---

[13] *Id.* R. 3.06(e).

[14] *Id.* R. 4.02(a).

[15] *Id.* R. 5.03(a).

[16] *Id.* R. 5.03(b).

An expert on surveys testified about the manner and means of executing the survey. He described the survey as attempting to persuade (a "push poll") in certain respects and relatively balanced message testing in others.

Collectively, the two experts expressed generalized concerns about:

• a litigant conducting a pretrial poll in the county of suit, from which the jury would be drawn;

• the failure to ensure persons connected with the case were not excluded from the survey database;

• the lack of randomization of some questions that painted adverse parties in a negative light;

• the relative strength of statements adverse to Titeflex compared to the negative statements about other potentially responsible parties;

• whether some statements were false and misleading or merely relied on disputed facts to be litigated, for example, whether the CSST pipe had been installed improperly;

• the survey's efforts to compare the respondents' initial impressions about legal responsibility with the respondents' impressions after hearing variously formulated "statements"; and

• the inclusion of specific references to the underlying lawsuit without identifying the survey's sponsor in any manner.

A third expert also testified about professional ethics. He opined that (1) pretrial surveys are not specifically prohibited by any governing authority, (2) neither the survey nor Brewer violated any disciplinary rule, and (3) Brewer reasonably relied on an independent third-party professional to design and execute the survey.

11

All 20,000 names included in the survey database were produced,[17] but the record includes no evidence or testimony about how many of those individuals were contacted to secure 300 completed survey responses. Nor were the identities of those who completed the survey disclosed. However, review of the survey database revealed that several city employees and government officials associated with the lawsuit or moratoriums had been included as potential contacts, leading the City Attorney to conclude the poll was "targeting" particular government servants. Sitting judges, city council members, other government officials, and members of the trial judge's staff and family were also on the list. Brewer testified these "unfortunate" and "horrible coincidence[s]" were the by-product of random selection and confessed that he had not thought to provide guidance to Public Opinion Strategies about exclusions from a randomly generated survey sample.

The trial court also heard evidence that, in conducting the survey, SSI had in fact spoken with immediate family members of three previously deposed witnesses, two of whom were government employees ostensibly represented by the City Attorney. During the survey window, SSI called (1) mobile and landline numbers assigned to Chris Beeson, co-owner of Fireplaces Unlimited, which Titeflex had designated as a potentially responsible third party; (2) the home number for Steve O'Neal, the City of Lubbock's Chief Building Official; and (3) a mobile number associated with Tommy Jeter, a city building inspector and subordinate of Steve O'Neal. The spouse of each of these witnesses answered one or more of SSI's calls. Two spouses participated in the survey long enough to determine the calls were about this lawsuit, but none of them completed the survey.

---

[17] Lubbock County has a population of nearly 300,000 and a jury pool of a little more than half its population.

Notably, the record bears no evidence that a survey participant could not be contacted multiple times or through multiple telephone numbers in a randomly conducted survey using CATI software. And no expert testified that anyone connected with the case was more likely than not "targeted." Indeed no expert witness impugned—statistically or even anecdotally—the randomness of either the survey database or the selections from the database. At most, the survey expert testified the 20,000 name survey database was not "completely" random because it resulted from at least some defined parameters (in this case, Lubbock County residents over age 18) and was "likely" drawn from public records, which would include registered voters who might be called to serve on a jury; he acknowledged, however, that CATI software would have randomly selected respondents from the survey database.

Finally, the court heard evidence that the week after the survey concluded, Brewer filed an ethics complaint against Steve O'Neal and the assistant fire marshal, calling on the City to investigate whether their "free trip" to Massachusetts for the product-testing demonstration violated the city charter. The complaint was hand-delivered to the Lubbock City Council and contemporaneously released to the media. The sanctions movants characterized this as a witness-intimidation tactic.[18]

At the conclusion of the sanctions hearing, the trial court took the matter under advisement. The court expressed uncertainty about whether the requested sanctions were warranted but stated that "what was done . . . was [not] right." The court requested supplemental briefing from the

---

[18] TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 4.04(b) ("A lawyer shall not present, participate in presenting, or threaten to present: (1) criminal or disciplinary charges solely to gain an advantage in a civil matter . . . .").

parties addressed to whether sanctions were justified as a legal matter and affidavits to support the attorneys' fees requested as sanctions.

Fifteen months later, the trial court issued a lengthy letter ruling imposing sanctions against Brewer individually but not the law firm. The court ordered Brewer to complete ten hours of legal-ethics education and pay the movants a total of $133,415.27 in attorneys fees and expenses, plus $43,590 in contingent fees and expenses.[19] The letter ruling generally addressed the content and execution of the survey, Brewer's errors and omissions in undertaking the pretrial survey, and Brewer's demeanor at the sanctions hearing. The court did not find that Brewer violated any disciplinary rules or other applicable authority, but instead concluded that Brewer's conduct "taken

---

[19] The breakdown of fees and expenses awarded is as follows:

To third-party defendant Lennox Hearth Products, LLC:
- Attorney's Fees: $29,500.00
- Expenses: $3,500.00
- Contingent Attorney's Fees and Expenses: $17,300

To co-defendant Turner & Witt Plumbing:
- Attorney's Fees: $11,032.00
- Expenses: $1,919.76
- Contingent Attorney's Fees & Expenses: $7,190

To third-party defendant Strong Custom Builders, LLC:
- Attorney's Fees: $8,170.00
- Expenses: $554.83
- Contingent Attorney's Fees: $3,000.00

To third-party defendant Thermo Dynamic Insulation, LLC:
- Attorney's Fees: $16,038.00
- Expenses: $3,738.68
- Contingent Attorney's Fees: $6,600

To the subrogee insurance company, State Farm Lloyds Insurance Company:
- Attorney's Fees: $27,312.00
- Contingent Attorney's Fees: $5,000.00

To plaintiffs Ken Teel, Becky Teel, Ross Rushing, and Meg Rushing:
- Attorney's Fees: $31,650.00
- Contingent Attorney's Fees: $4,500.00

14

in its entirety," including actions of his agents and subordinates, was "an abusive litigation practice that harms the integrity of the justice system and the jury trial process" and was "intentional[,] in bad faith[,] and abusive of the legal system and the judicial process specifically."

With regard to the survey's execution, the court disbelieved testimony that the polling efforts were random and coincidental and found Brewer was "grossly negligent" in failing to provide a no-contact list of parties and witnesses to the third-party vendor. In support of these findings, the court noted that (1) the pollster had actually made contact with represented and unrepresented parties and witnesses and (2) the survey database included members of the trial judge's family and staff, several government employees and officials, designated third parties, and spouses of the foregoing without regard to whether they were represented by counsel.

As to the survey's contents, the trial court determined it was "designed to improperly influence a jury pool" by disseminating information "without regard to it[s] truthfulness or accuracy" and by including "several questions . . . designed to influence or alter the opinion or attitude of the person being polled . . . ." Rejecting Brewer's argument that "he bears clean hands because the poll was a blind study conducted by a third party vendor," the court cited Brewer's testimony that he (1) bore supervisory responsibility for his employees and consultants, (2) reviewed and approved the poll questions, and (3) "instruct[ed] and guid[ed] the pollster on the purpose and composition of the poll."

The letter ruling does not identify the portions of the survey's contents that were objectionable, improper, or inaccurate. However, the court noted that four federal district courts in Texas have standing orders regulating the manner of conducting community attitude studies (mock trials, focus groups, and the like) when the survey is conducted in the division where the case is

15

pending, noting one of the orders "discourages" the practice and the orders collectively "serve as an excellent blueprint for the manner by which a proper survey/poll should be conducted." Though no similar order was in place for the underlying litigation, the trial court faulted Brewer for failing to adhere to similar parameters.

Finally, the court found Brewer's attitude in response to the sanctions motion "concerning" due to his (1) "nonchalant and uncaring" demeanor and (2) "repeatedly evasive" responses to questioning, which during a day of questioning, had prompted the court to sustain a total of four objections to responsiveness and twice instruct Brewer to answer the question asked.

Brewer appealed the sanctions order and denial of his motion for continuance. The court of appeals affirmed, holding the trial court had authority to sanction Brewer's conduct, the sanctions award was appropriate and not excessive, and any error in denying Brewer's request for a continuance was harmless.[20] As to the propriety of sanctions, the court found no abuse of discretion because the record supported the trial court's "perce[ption] [that] Brewer's 'intentional and bad faith' conduct in connection with the telephone survey" imperiled the court's core judicial functions of "empanel[ing] an impartial jury and try[ing] a case with unintimidated witnesses."[21]

Brewer's petition for review to this Court argues the sanctions award must be vacated because the record does not support the trial court's finding that he acted in bad faith or significantly interfered with a core judicial function in commissioning a public opinion poll or otherwise. He contends both findings are necessary prerequisites to the exercise of a court's inherent power to sanction. In the alternative, he urges the Court to remand for a new sanctions hearing because he

[20] 546 S.W.3d 866, 885-86 (Tex. App.—Amarillo Mar. 2018).

[21] *Id.* at 881.

was not properly notified about the hearing and had inadequate time to conduct discovery and prepare an appropriate defense.

## II. Discussion

The decision to impose sanctions involves two distinct determinations: (1) whether conduct is sanctionable and (2) what sanction to impose.[22] Both decisions are subject to appellate review, but Brewer challenges only the former in this case. The dispositive issue on appeal is whether the trial court properly exercised its inherent authority to sanction Brewer based on the manner in which a pretrial survey was conducted on his client's behalf in connection with complex, high-profile litigation. No litigant claims the trial court acted pursuant to a rule or statute authorizing sanctions in this instance. Nor does any litigant contend that a rule, statute, order, or any other authority proscribed or conscribed the use of a pretrial survey in the underlying litigation. The dispute is whether the latter circumstance necessarily precludes the court from imposing sanctions under its inherent authority or whether sanctions were permitted—with or without evidence of bad faith—because the trial court could have concluded that certain aspects of the survey crossed ethical lines and threatened the integrity of the jury system.

We agree with the court of appeals that (1) bad faith is required to support sanctions imposed under a court's inherent authority;[23] (2) bad faith can exist without explicitly violating a rule, statute, or ethical code of conduct;[24] (3) direct evidence of bad faith is not required;[25] (4) an attorney acting

---

[22] *See In re Bennett*, 960 S.W.2d 35, 39 (Tex. 1997) (sanctioning counsel requires the court to determine whether the attorney has abused the judicial process and what sanction is appropriate).

[23] 546 S.W.3d at 878-79.

[24] *Id.* at 880.

[25] *Id.* at 879-80.

in bad faith can be sanctioned for conducting a pretrial attitudinal survey even when no authority specifically prohibits or constrains the use of such a survey;[26] and (5) neither the absence of actual interference with the jury venire nor the potential for rectifying any harm through voir dire negates the existence of bad faith.[27] However, mere violation of a rule, statute, or ethical standard does not *ipso facto* constitute bad faith. An error, without more, is no evidence of improper motive,[28] unless the conduct could not have occurred without conscious wrongdoing.[29]

---

[26] *Id.* at 876-78.

[27] *Id.*; *cf. Primrose Operating Co. Inc. v. Jones*, 102 S.W.3d 188, 192 (Tex. App.—Amarillo 2003, pet. denied) (observing that the effect of a pretrial community attitude study—a mock trial—had been thoroughly explored during jury voir dire examination and a mistrial was therefore unwarranted even though plaintiffs' counsel declined to furnish a list of mock-trial participants).

[28] The cases of *McWhorter v. Sheller*, 993 S.W.2d 781 (Tex. App.—Houston [14th Dist.] 1999, pet. denied), and *Onwuteaka v. Gill*, 908 S.W.2d 276, 280 (Tex. App.—Houston [1st Dist.] 1995, no writ), are ready examples. In *McWhorter*, an attorney failed to alert the court and opposing counsel that she was recording a telephonic conference for the purpose of preparing a draft order reflecting the court's findings. Even though the order "tracked the telephone conference," "the findings were specific and [the court] felt comfortable adopting them," and counsel was not acting in bad faith, the court sanctioned the attorney. The court of appeals reversed, noting the record reflected "at best, some degree of inexperience and negligence on [the attorney's] part, rather than an intentional act made in bad faith." In *Onwuteaka*, the trial court struck an attorney's plea in intervention seeking to recover a contingency fee, because he was not present when his case was called. 908 S.W.2d at 280. Although the attorney timely arrived at the courthouse, he was told his case was set for "standby" and the clerk would call him when the case was assigned, that day or maybe the next. *Id.* Counsel returned to the courthouse as soon as he got the call, while his assistant called the court clerk to advise her that he was on his way. *Id.* at 280-81. He arrived too late, but the record bore no evidence that, before trial began, counsel knew the case had taken off "standby" status. *Id.* at 281. The court of appeals vacated the sanctions order for two independent reasons: (1) counsel's conduct was merely negligent, not in bad faith as required to impose sanctions under a court's inherent authority, and (2) the record did not bear evidence of flagrant bad faith as required for the particular sanction imposed. *Id.* at 280-81.

[29] For example, under no circumstance could a litigant or counsel be acting innocently or in good faith while directing an obscene gesture to the court or a trial participant.

Pretrial surveys are not uncommon and are neither categorically permissible nor inherently suspect.[30] And while the absence of authoritative guidance is not a license to act with impunity,[31] bad faith is required to impose sanctions under the court's inherent authority.[32] We hold the sanctions order in this case cannot stand because evidence of bad faith is lacking. Even if the survey Brewer commissioned was not flawlessly designed or executed, the record bears no evidence that Brewer, individually or through his agents, developed or employed the survey for an improper purpose. Accordingly, we need not consider whether "substantial interference with the court's legitimate exercise of one of its traditional core functions" is an additional requirement, as Brewer asserts.[33]

---

[30] *See U.S. v. Collins*, 972 F.2d 1385, 1399-1400 (5th Cir. 1992) (pretrial telephone survey in the district from which the jury pool was drawn did not compromise the integrity of the jury system even though it was not disclosed by the prosecution, offered the prosecution's version of the evidence, and inquired as to opinions about the defendants' guilt or innocence based on the evidence as presented).

[31] *See In re Bennett*, 960 S.W.2d 35, 40 (Tex. 1997) (counsel knowingly undertook conduct designed to circumvent local rules ensuring random assignment of cases).

[32] *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980) (holding "the trial court did not make a specific finding as to whether counsel's conduct constituted or was tantamount to bad faith, a finding that would have to precede any sanction under the court's inherent powers.").

[33] *See Kennedy v. Kennedy*, 125 S.W.3d 14, 19 (Tex. App.—Austin 2002, pet. denied) ("A court cannot invoke its inherent power to sanction without some evidence and factual findings that the conduct complained of significantly interfered with the court's legitimate exercise of one of its traditional core functions.").

## A. Standard of Review

We review a trial court's sanctions order for abuse of discretion.[34]  A trial court abuses its discretion if it acts without reference to guiding rules and principles such that the ruling is arbitrary or unreasonable.[35]  Although we view conflicting evidence favorably to the court's decision,[36] we are not bound by a trial court's fact findings or conclusions of law and must, instead, review the entire record independently to determine whether the trial court abused its discretion.[37]  A decision lacking factual support is arbitrary and unreasonable and must be set aside.[38]

## B. Inherent Power to Sanction

Various rules and statutes imbue courts with authority to sanction attorneys for professional lapses of one kind or another with or without bad faith.[39]  Courts also possess inherent powers that aid the exercise of their jurisdiction, facilitate the administration of justice, and preserve the independence and integrity of the judicial system.[40]  A court's inherent authority includes the "power to discipline an attorney's behavior."[41]

---

[34] *Cire v. Cummings*, 134 S.W.3d 835, 838-39 (Tex. 2004).

[35] *Id.*

[36] *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998).

[37] *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006).

[38] *Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997).

[39] *See supra* n.2.

[40] *Eichelberger v. Eichelberger*, 582 S.W.2d 395, 399 (Tex. 1979).

[41] *See In re Bennett*, 960 S.W.2d 35, 40 (Tex. 1997).

Inherent authority emanates "from the very fact that the court has been created and charged by the constitution with certain duties and responsibilities."[42]  Indeed, courts "'are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.'"[43]  Courts are accordingly empowered to punish an attorney's behavior even when the offensive conduct is not explicitly prohibited by statute, rule, or other authority.[44]

That power is not boundless, however.  The inherent authority to sanction is limited by due process, so sanctions must be just and not excessive.[45]  Moreover, "[b]ecause inherent powers are shielded from direct democratic controls,"[46] and "[b]ecause of their very potency, inherent powers must be exercised with restraint[,] discretion,"[47] and "great caution."[48]  To that end, invocation of the court's inherent power to sanction necessitates a finding of bad faith.[49]

With the understanding that inherent powers must be used sparingly, our appellate courts have consistently held that a court's inherent power to sanction "exists to the extent necessary to

---

[42] *Eichelberger*, 582 S.W.2d at 398.

[43] *Chambers v. NASCO, Inc.* 501 U.S. 32, 43 (1991) (quoting *Anderson v. Dunn*, 19 U.S. 204, 227 (1821)).

[44] *Bennett*, 960 S.W.2d at 40.

[45] *Id.*; *TransAmerican Nat'l Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991).

[46] *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980).

[47] *Chambers*, 501 U.S. at 44; *accord Roadway Exp.*, 447 U.S. at 764.

[48] *Chambers*, 501 U.S. at 43 (quoting *Ex Parte Burr*, 6 L. Ed. 152 (1824)).

[49] *Roadway Exp.*, 447 U.S. at 767 (imposition of "any sanction under the court's inherent authority" requires a finding of bad-faith conduct); *see Chambers*, 501 U.S. at 49-50 (1991) ("[A] federal court is [not] forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules.  A court must, of course, exercise caution in invoking its inherent power and it must comply with mandates of due process, both in determining that the requisite bad faith exists and in assessing fees.").

21

deter, alleviate, and counteract bad faith abuse of the judicial process . . . ."[50] Bad faith is not just intentional conduct but intent to engage in conduct for an impermissible reason, willful noncompliance, or willful ignorance of the facts.[51] "Bad faith" includes "conscious doing of a wrong for a dishonest, discriminatory, or malicious purpose."[52] Errors in judgment, lack of diligence, unreasonableness, negligence, or even gross negligence—without more—do not equate

---

[50] *Houtex Ready Mix Concrete & Materials v. Eagle Const. & Envtl. Servs., L.P.*, 226 S.W.3d 514, 524 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *accord, e.g.*, *Darnell v. Broberg*, 565 S.W. App.—El Paso 2018, no pet.)*; Liles v. Contreras*, 547 S.W.3d 280 (Tex. App.—San Antonio 2018, pet. denied); *Guerra v. L&F Distribs.*, 521 S.W.3d 878, 890 (Tex. App.—San Antonio 2017, no pet.); *Fast Invs., LLC v. Prosper Bank*, No. 02-13-00026-CV, 2014 WL 888438 (Tex. App.—Fort Worth Mar. 6, 2014, no pet.) (mem. op.); *McDonald v. State*, 401 S.W.3d 360 (Tex. App.—Amarillo 2013, pet. ref'd); *Union Carbide Corp. v. Martin*, 349 S.W.3d 137 (Tex. App.—Dallas 2011, no pet.); *Ezeoke v. Tracy*, 349 S.W.3d 679 (Tex. App.—Houston [14th Dist.] 2011, no pet.); *Dike v. Peltier Chevrolet, Inc.*, 343 S.W.3d 179 (Tex. App.—Texarkana 2011, no pet.); *Wythe II Corp. v. Stone*, 342 S.W.3d 96, 113 (Tex. App.—Beaumont 2011, pet. denied); *Davis v. Rupe*, 307 S.W.3d 528, 531 (Tex. App.—Dallas 2010, no. pet.); *Finlan v. Peavy*, 205 S.W.3d 647 (Tex. App.—Waco 2006, no pet.); *Howell v. Tex. Workers' Comp. Comm'n*, 143 S.W.3d 416, 446-47 (Tex. App.—Austin 2004, pet. denied); *McWhorter v. Sheller*, 993 S.W.2d 781 (Tex. App.—Houston [14th Dist.] 1999, pet. denied); *Keithly v. P.G.D., Inc.*, No. 08-99-00278-CV, 2000 WL 1681066 (Tex. App.—El Paso Nov. 9, 2000, no pet.) (mem. op.); *Williams v. Azko Nobel Chems. Inc.*, 999 S.W.3d 836, 843 (Tex. App.—Tyler 1999, no pet.); *Onwuteaka v. Gill*, 908 S.W.2d 276, 280 (Tex. App.—Houston [1st Dist.] 1995, no writ); *Kutch v. Del Mar Coll.,* 831 S.W.2d 506, 510 (Tex. App.—Corpus Christi 1992, no writ); *see also Clark v. Bres*, 217 S.W.3d 501, 512 (Tex. App.—Houston [14th Dist.] 2006, pets. denied) ("Even in the absence of an applicable rule or statute, courts have the authority to sanction parties for bad faith abuses if it finds that to do so will aid in the exercise of its jurisdiction, in the administration of justice, and the preservation of its independence and integrity.").

Some courts have further articulated, as an additional requirement, that "the conduct complained of significantly interfered with the court's legitimate exercise of one of its traditional core functions." *Kennedy v. Kennedy*, 125 S.W.3d 14, 19 (Tex. App.—Austin 2002, pet. denied) (party's actions subjected her to contempt of court but not sanctions under a statute or rule, or even under the court's inherent power to sanction for abuse of the judicial process, which requires evidence and findings of significant interference with core judicial functions (citing *Kutch*, 831 S.W.2d 506, 510 (Tex. App.—Corpus Christi 1992, no writ), which articulates bad faith as a predicate to inherent-authority sanctions)). *But see In re J.V.G.*, No. 09-06-015CV, 2007 WL 2011019, at *5 (Tex. App.—Beaumont July 12, 2007, no pet.) (mem. op.) (upholding sanctions because counsel's pattern of conduct "significantly interfered" with core judicial functions and stating "bad faith" is "one basis for imposing inherent authority sanctions" but "broader considerations are involved when reviewing the propriety of sanctions imposed").

[51] *Cf. Assoc. Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285 (Tex. 1998) (explaining in the surety context that "'bad faith' means more than merely negligent or unreasonable conduct; it requires proof of an improper motive or wilful ignorance of the facts"); *Citizens Bridge Co. v. Guerra*, 258 S.W.2d 64, 69-70 (Tex. 1953) (willful ignorance is the equivalent of bad faith).

[52] *Pearson v. Stewart*, 314 S.W.3d 242, 248 (Tex. App.—Fort Worth 2010, no pet.); *Zuehl Land Dev., LLC v. Zuehl Airport Flying Cmty. Owners Ass'n, Inc.*, 510 S.W.3d 41, 53 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Robson v. Gilbreath*, 267 S.W.3d 401, 407 (Tex. App.—Austin 2008, pet. denied); *Elkins v. Stotts-Brown*, 103 S.W.3d 664, 669 (Tex. App.—Dallas 2003, no pet.).

to bad faith.[53] Improper motive,[54] not perfection,[55] is the touchstone. Bad faith can be established with direct or circumstantial evidence, but absent direct evidence, the record must reasonably give rise to an inference of intent or willfulness.[56]

An illustrative case involving the use of inherent authority to sanction attorney misconduct is *In re Bennett*, which involved an attorney's plan to deliberately circumvent rules implementing random assignment of cases in the district courts.[57] The attorney sequentially filed seventeen lawsuits with the same factual allegations and the same legal claims against the same defendants, but with different plaintiff groups.[58] Each case was randomly assigned, but plaintiffs' counsel instructed the clerk of the court not to prepare service of citation for the first sixteen filings.[59] Mere hours after securing assignment to a particular judge for the seventeenth lawsuit, plaintiffs' counsel amended the petition in that case to add approximately seven hundred plaintiffs.[60] Soon after, counsel attempted to nonsuit the sixteen previously filed lawsuits.[61] The trial judge assigned to the

---

[53] *See Assoc. Indem.*, 964 S.W.2d at 285 (discussing bad faith in the surety context); *Gomer v. Davis*, 419 S.W.3d 470, 478 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Elkins*, 203 S.W.3d at 664.

[54] *Zuehl*, 510 S.W.3d at 54; *Dike v. Peltier Chevrolet, Inc.*, 343 S.W.3d 179, 194 (Tex. App.—Texarkana 2011, no pet.); *Robson*, 267 S.W.3d at 407.

[55] *See Dike*, 343 S.W.3d at 191; *cf. Cosgrove v. Grimes*, 774 S.W.2d 662, 664-65 (Tex. 1989) (good-faith defense to a legal malpractice action is governed by an objective inquiry: "An attorney who makes a reasonable decision in the handling of a case may not be held liable if the decision later proves to be imperfect.").

[56] *Zuehl*, 510 S.W.3d at 54; *Dike*, 343 S.W.3d at 194.

[57] 960 S.W.2d 35, 36-37 (Tex. 1997).

[58] *Id.* at 36.

[59] *Id.*

[60] *Id.* at 36-37.

[61] *Id.* at 37.

first-filed case sanctioned plaintiffs' counsel for knowingly and intentionally violating rules providing for random assignment.[62] Plaintiffs' counsel admittedly gamed the system to ensure assignment to a particular court, but such activities were not expressly prohibited.[63] We nevertheless upheld the sanctions order.[64] We considered counsel's overall course of conduct as well as his expressed intent and held that subversion of random assignment procedures is "an abuse of the judicial process" that "if tolerated, breeds disrespect for and threatens the integrity of our judicial system."[65] *Bennett* involved rules that did not specifically prohibit the attorney's conduct, but the attorney's filings exhibited a pattern giving rise to an inference of improper motive, which he admitted.

We have had few occasions to consider conduct sanctionable only under a court's inherent authority, and when we have done so, we have not explicitly articulated bad faith as a predicate finding. But we have used equivalent language;[66] we have not upheld a sanction where bad faith conduct was lacking; and we have observed that the severity of the sanction imposed turns on the

---

[62] *Id.*

[63] *Id.*

[64] *Id.* at 40.

[65] *Id.*

[66] *See, e.g.*, *Bennett*, 960 S.W.2d at 40 (stating courts have inherent authority to sanction attorneys who "abuse [] the judicial process" and citing *Lawrence v. Kohl*, 853 S.W.2d 697, 700 (Tex. App.—Houston [1st Dist.] 1993, no writ), and *Kutch v. Del Mar College*, 831 S.W.2d 506, 509-10 (Tex. App.—Corpus Christi 1992, no writ), for the proposition that "trial courts have the power to sanction parties for *bad faith abuse* of the judicial process not covered by rule or statute" (emphasis added)); *id.* (noting the egregious conduct at issue there would "if tolerated, breed[] disrespect for and threaten[] the integrity of our judicial system"); *see also Abuse*, OXFORD AMERICAN DICTIONARY & THESAURUS (3d ed. 2010) ("use something to bad effect or for a bad purpose"); *Abuse*, WEBSTER'S SECOND NEW UNIVERSITY DICTIONARY 69 (1984) ("to use wrongly or improperly").

*degree* of bad faith.[67] Today's concurring opinion agrees that bad faith is a prerequisite to a sanctions award, but only for certain sanctions, like attorney's fees, and not other types of sanctions, like requiring hours of legal-ethics education.[68] The distinction the concurrence makes lacks clarity and provides no guidance to trial courts.[69] More significantly, it ignores decades of jurisprudence that has ably guided Texas courts,[70] is derived from a misreading of the Supreme Court's opinion

---

[67] *See Altesse Healthcare Sols. v. Wilson*, 540 S.W.3d 570, 575-76 (Tex. 2018) ("extreme sanctions" like death-penalty sanctions require *flagrant* bad faith).

[68] *Post* at 6-7.

[69] In urging bad faith is required only for some sanctions and not others, the concurrence cites three cases as allowing courts to invoke inherent authority to impose sanctions based only on "significant interference" with core judicial functions. *Post* at 8-9. Two of those cases do not so hold, *see infra* n. 70, but more problematically, the concurrence never says *whether* that is the standard and, if so, *how* that standard is satisfied on this record. Indeed, the concurrence does not identify *any* standard as guiding invocation of a court's inherent authority to sanction parties and counsel. The concurrence studiously avoids the issue, but as the highest civil court in the state, we have a duty to establish standards and settle the law, not unsettle the law and leave the applicable standards in doubt.

[70] *See supra* n.50. With the weight of authority decidedly in opposition, the concurrence's contrary view rests on a single unpublished case with flawed reasoning that has not been followed by any other court, including its own. *Post* at 9 (citing *In re J.V.G.*, No. 09-06-015CV, 2007 WL 2011019 (Tex. App.—Beaumont July 12, 2007, no pet.) (mem. op.)). *But see Wythe II Corp. v. Stone*, 342 S.W.3d 96, 113 (Tex. App.—Beaumont 2011, pet. denied) (observing inherent authority to sanction exists "to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process"). The opinion in *J.V.G.* states that bad faith is but one basis for imposing sanctions and holds sanctions were proper there for a pattern of conduct that "significantly interfered with" a core judicial function. *Id.* at *5-8. But all of the cases *J.V.G.* relied on treated "significant interference" as a required component of a bad-faith finding, not as an alternative standard. *See In re K.A.R.*, 171 S.W.3d 705, 712 n.3, 714-15 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (observing bad-faith conduct findings were unchallenged and conduct significantly interfered with core judicial functions); *Kings Park Apts., Ltd. v. Nat'l Union Fire Ins. Co.*, 101 S.W.3d 525, 541 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (evidence that a party instructed a paralegal to steal documents from the judge's chambers authorized sanctions under the trial court's inherent authority); *Roberts v. Rose*, 37 S.W.3d 31 (Tex. App.—San Antonio 2000, no pet.) ("Roberts's deliberate acts of bad faith throughout his representation" were evidence of bad faith that supported the imposition of sanctions against him).

The concurrence also misstates the holdings in *Kennedy v. Kennedy*, 125 S.W.3d 14, 19 (Tex. App.—Austin 2002, no pet.), and *McWhorter v. Sheller*, 993 S.W.2d 781, 789 (Tex. App.—Houston [14th Dist.] 1999, pet. denied), as rejecting bad faith as the guiding standard. But both *Kennedy* and *McWhorter* hold only that sanctions not authorized by rule or statute cannot stand without a finding and evidence of significant interference with core judicial functions, an issue raised here that we do not reach. Notably, both courts relied on *Kutch v. Del Mar College*, which articulates the standard as requiring *both* bad faith and significant interference. 831 S.W.2d 506, 509-10 (Tex. App.—Corpus Christi 1992, no writ) ("We hold Texas courts have inherent power to sanction for bad faith conduct during litigation."). More to the point, the Austin and Houston courts of appeals have long articulated the standard for inherent-authority sanctions as requiring bad faith. *See supra* n.50.

in *Chambers v. NASCO, Inc.*,[71] and inverts the analysis by looking to the particular sanction imposed

to determine whether conduct is sanctionable in the first instance.[72] But whether counsel should

---

[71] The concurrence misconstrues *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), as requiring bad faith to support inherent-authority sanctions *only* when the court chooses attorney's fees as the particular sanction. *Post* at 6. Of course, it is true the Supreme Court required bad faith to support an award of attorney's fees as a sanction, because bad faith is necessary whenever a court invokes inherent authority to impose *any* sanction. *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980). But *Chambers* actually involves the analytically obverse issue—whether attorney's fees could *ever* be imposed as a sanction in light of the American Rule's restriction on fee shifting. *Chambers*, 501 U.S. at 45, 51; *see Travelers Indem. Co. v. Mayfield*, 923 S.W.2d 590, 594 (Tex. 1996) (allowing trial courts to award attorney's fees "under the guise of 'inherent authority' would constitute a judicial end-run around the statutory fee-shifting scheme"). The Court held attorney's fees could indeed be awarded as a sanction under a court's inherent authority, *id*. at 51, 57, and more recently has clarified that such an award is limited to only those fees causally related to the bad faith conduct. *Goodyear Tire & Rubber Co. v. Heager*, 137 S. Ct. 1178, 1184 (2017) (a federal court's inherent authority to award attorney's fees as a sanction for bad-faith conduct is limited to the fees the innocent party incurred solely because of the misconduct). So, while trial courts do not have inherent authority to award attorney's fees when not provided by contract or statute, courts have inherent authority to impose sanctions for bad-faith conduct and those sanctions can include attorney's fees incurred because of the misconduct.

The Supreme Court cases the concurrence cites are not inconsistent with our holding today. *Post* at 6-7. Those cases affirm that courts possess inherent authority to enforce their lawful mandates by contempt, manage their dockets, and dismiss with prejudice cases involving deliberate and undue delay. *See Young v. U.S. ex rel Vuitton et Fils S.A.*, 481 U.S. 787, 796 (1987) (criminal contempt power); *Illinois v. Allen*, 397 U.S. 337, 343 (1970) (criminal contempt power); *Link v. Wabash R. Co.,* 370 U.S. 626, 630-31 (1962) (docket management and dismissal with prejudice). Contempt requires willful disobedience—engaging in specifically and definitely prohibited conduct. *See Lee v. State*, 799 S.W.2d 750, 753 (Tex. Crim. App. 1990) ("Because it is the disobedience of the inherent authority of the court that is at issue, it follows that a court, before exercising its contempt powers, must have provided the person it seeks to punish with specific and definite notice of those acts which he may or may not perform without the risk of being held in contempt."); *accord, e.g.*, *Allen*, 397 U.S. at 353 (holding a defendant can be excluded from trial for stubbornly defiant, contumacious, and disruptive behavior after being *warned* by the judge to cease and desist). Here, the trial court neither exercised its contempt power nor could on this record. What is more, this case involves inherent authority to sanction, not the court's inherent authority to manage a docket. As to the former, *Link*, which involved dismissal with prejudice as a sanction for deliberate dilatory conduct, accords with our analysis. *See Link*, 370 U.S. at 630-32 ("[I]t could reasonably be inferred from [petitioner's] absence [at a court-ordered hearing and] from the drawn-out history of the litigation that petitioner had been deliberately proceeding in dilatory fashion."). The concurrence's citation to *Anderson v. Dunn*, 19 U.S. 204, 227 (1821), is confounding as that case involves inherent powers of Congress to compel attendance at contempt proceedings, which is not even close to being the same issue.

[72] Sanctioning counsel involves a two-step determination: "[1] whether the attorney has abused the judicial process, and, [2] if so, what sanction would be appropriate." *In re Bennett*, 960 S.W.2d 35, 39 (Tex. 1997) (quoting *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 396 (1990))). The concurrence's analysis puts the proverbial cart before the horse, collapsing the second inquiry—what sanction is appropriate—onto the first—whether conduct is sanctionable at all. This root flaw is most readily apparent in the discussion regarding sanctions for spoliation. *Post* at 5. Trial courts have some discretion to fashion an appropriate remedy for discovery abuse, including spoliation, but whether spoliation occurred at all depends on the existence of a duty to preserve evidence, which is a question of law. *Brookshire Bros., Ltd. v. Aldridge*, 428 S.W.3d 9, 14, 20 (Tex. 2014) ("[A] spoliation analysis involves a two-step judicial process: (1) the trial court must determine, as a question of law, whether a party spoliated evidence, and (2) if spoliation occurred, the court must assess an appropriate remedy . . . Upon a finding of spoliation, the trial court has broad discretion to impose a remedy that, as with any discovery sanction, must be proportionate[.]"); *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 722 (Tex. 2003) (declining to consider whether a particular sanction for spoliation was justified because the

26

receive *any sanction at all* is a serious matter that impugns counsel's professional judgment and ethical standing. It must be treated as such.

Requiring a predicate finding of bad faith before imposing sanctions under the amorphous and uniquely powerful inherent authority to sanction does not "handcuff[]" courts as the concurrence says.[73] Courts have many tools at their disposal under rules and statutes that are relatively specific in defining the duties imposed and the conduct proscribed, many of which do not require bad faith or its equivalent.[74] But to wield inherent powers of intrinsic potency and unconstrained breadth necessitates the restraint and caution the bad-faith predicate encapsulates.[75]

### C. Brewer's Conduct

In imposing sanctions on Brewer, the trial court took issue with certain aspects of the telephone survey's contents and execution and found Brewer's courtroom demeanor disconcerting. Though the survey Brewer commissioned is not without its faults, the evidence shows he undertook reasonable efforts to secure a third-party industry professional to create a relatively balanced public

---

defendant had no duty to preserve the evidence in question, so no sanction was warranted in the first place). As to remedies, "spoliation is essentially a particularized form of discovery abuse" that is sanctionable in accordance with Civil Procedure Rule 215. *Brookshire Bros., Ltd. v. Aldridge*, 428 S.W.3d at 18, 21; *see* TEX. R. CIV. P. 215.2-.3 (sanctions for discovery abuse include attorney's fees and an order designating "facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order").

[73] *Post* at 2-3.

[74] *See supra* n.2 & *infra* n.76.

[75] By merely rubber stamping amorphous trial court "findings" that are neither facts nor conclusions of law, the concurrence proves the point. *See post* at 9-10. Worse, the concurrence misapprehends the applicable standard of review and fails to identify any guiding principles governing the trial court's discretion. "In reviewing sanctions orders, the appellate courts are not bound by a trial court's findings of fact and conclusions of law; rather, appellate courts must independently review the entire record to determine whether the trial court abused its discretion." *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006); *see Cire v. Cummings*, 134 S.W.3d 835, 838-39 (Tex. 2004) (a court abuses its discretion if it acts without reference to guiding rules and principles). An opinion, no mater how genuinely held, must nonetheless be supported by evidence and must adhere to guiding principles. The concurrence identifies neither. If the concurrence is embracing "significant interference with a core judicial function" as an additional or alternative standard, it is impossible to discern.

opinion survey for random administration. The record bears no direct, or even circumstantial, evidence of bad faith.

Brewer did not disobey any court order, knowingly or otherwise. The trial court did not find that Brewer violated any disciplinary rule, nor is there evidence Brewer knowingly violated any disciplinary rule.[76] Neither is there evidence that Brewer knew, or even had reason to believe, that a randomly generated database of roughly seven percent of the county population would result in any touch points connected to this case, let alone many. At worst, Brewer was lax in failing to ensure the survey was *not* totally random by securing the exclusion of case-related individuals from the survey database.[77] Leaving the matter entirely in a third party's hands could arguably constitute gross negligence, as the trial court found, but it does not give rise to a reasonable inference of bad faith. Reviewing the totality of the evidence leads us to conclude the trial court's concerns about the survey were reasonable, but the court's finding of bad faith is factually unsupported.

---

[76] The trial court's referral of the matter to the Commission for Lawyer Discipline is one method available to courts to help ensure ethical lapses are disciplined, when warranted, according to the processes, procedures, and standards of review applicable to all attorneys. If a judge has knowledge of unethical conduct, the judge can, and indeed must, refer the matter for disciplinary proceedings. *See* TEX. CODE JUD. CONDUCT, CANON 3(d)(2); TEX. DISCIPLINARY RULES OF PROF'L CONDUCT R. 8.03(a); *cf.* CODE OF CONDUCT FOR U.S. JUDGES cmt. 3(B)(6); *Comm'n for Lawyer Discipline v. Cantu*, 587 S.W.3d 779, 784 (Tex. 2019) ("The obligation to report attorney misconduct [to the State Bar] applied doubly to Judge Isgur, who is not only a judge but a licensed Texas attorney.")*; Remington Arms Co., Inc. v. Caldwell*, 850 S.W.2d 167, 172 (Tex. 1993) ("[T]he court itself is obligated to refer a lawyer to appropriate authorities to answer for unprofessional conduct of which the judge is aware.").

[77] Ensuring removal of individuals directly connected to a case should be relatively straightforward, but scrubbing a survey database of every person related to or affiliated with someone directly connected to a lawsuit may be difficult, if not infeasible, particularly when businesses, governmental entities, and other organizations are involved. Many names and surnames are common; relatives do not always share the same surname; relatives do not necessarily share the same address; and many people can be reached at more than one telephone number.

### 1. Public Opinion Surveys

Pretrial surveys are a useful litigation tool "to conduct research, get reliable results (both quantitative and qualitative), and create a winning trial strategy," while also "saving the [law] firm time, money, and resources in trial preparation."[78] In one form or another, surveys of the community from which the jury will be summoned have been conducted for almost eighty years.[79] Such surveys have even been conducted without rebuke in high-profile cases such as the Boston Bomber case,[80] the Oklahoma City bombing case,[81] the Ted Bundy trial,[82] and the Harrisburg-Seven trial.[83] Attorneys frequently rely on community surveys in complex commercial litigation and obscenity prosecutions,[84] and many law review articles, practice treatises, and other reliable secondary sources cite "public opinion surveys," "community surveys," and "opinion polls" as valid methods of

---

[78] Richard H. Middleton, Jr., *Competitive Pretrial Intelligence: Can Mock Trials and Focus Groups Be Advanced?*, 2002 ATLA-CLE 1361 (July 2002) (also noting that surveys were empirically tested and found to be more reliable and cost-effective than mock trials and focus groups in pretrial research and preparation).

[79] Cases from as early as the 1940s discuss the use of pretrial community surveys or public opinion research to support litigants' claims. *See, e.g.*, *Oneida, Ltd., v. Nat'l Silver Co.*, 25 N.Y.S.2d 271, 286 (N.Y. Sup. Ct. 1940) (housewives surveyed using the litigants' silverware patterns to determine whether one company had appropriated the other's design).

[80] Motion for Change of Venue at 1, *United States v. Tsarnaev*, No-13-10200-GAO, 2014 WL 4823882, at *1 (D. Mass. Sept. 24, 2014).

[81] *See* Christina Studebaker & Steven Penrod, *Pretrial Publicity, the Media, the Law, and Common Sense*, 3 PSYCHOL. PUB. POL'Y & L. 428, 450 (1997) (citing the trials of McVeigh and Nichols for employing "the use of a media analysis and public opinion surveys quite well").

[82] *Bundy v. Dugger*, 850 F.2d 1402, 1425 (11th Cir. 1988) (refusing to presume prejudice where a pretrial public opinion poll was conducted to determine community familiarity with serial killer Ted Bundy and opinions about his guilt).

[83] *See* Rachel Hartje, Comment, *A Jury of Your Peers?: How Jury Consulting May Actually Help Trial Lawyers Resolve Constitutional Limitations Imposed on the Selection of Juries*, 41 CAL. W. L. REV. 479, 491-92 (2005).

[84] *See* Gabriel M. Gelb & Betsy D. Gelb, *Internet Surveys for Trademark Litigation: Ready or Not, Here They Come*, 97 TRADEMARK REP. 1073, 1086–87 (2007); *see also Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 234 (2d Cir. 1999), *as amended on reh'g* (Sept. 29, 1999) (misrepresentation case dealing with pharmaceutical sales); *Com. v. Trainor*, 374 N.E.2d 1216, 1220 (Mass. 1978) (obscenity prosecution).

determining the community's attitude toward the parties, witnesses, or issues in a particular case.[85]

Examples of pretrial surveys are found in case law from almost every state and in the federal judicial system. Such surveys are not inherently improper.

*United States v. Collins* is a case in point.[86] *Collins* was an appeal from a federal judge's bribery conviction. Before the bribery case went to trial, the prosecutors commissioned a telephone survey of 457 respondents from within the district, asking questions related to the impending trial and specifically identifying the defendants by name.[87] Notably, "after hearing a recitation of the prosecution's version of the evidence against the [judge and a co-defendant], those polled were asked whether they thought the defendants were 'definitely guilty, probably guilty, probably not guilty, definitely not guilty or do you have no opinion in this case.'"[88] A majority of the respondents answered that the defendants were definitely or probably guilty.[89]

When the defendants learned about the survey, they reported it to the district court.[90] The court ordered the prosecution to turn over all polling material and, on review, determined the polling issue was a "red herring" and "nothing had been done to compromise the integrity of jury

---

[85] *See, e.g.*, *§ 14:10: Jury Selection Based on Juror Profiles and Investigations*, JURY SELECTION: THE LAW, ART, AND SCIENCE OF SELECTING A JURY, Thompson Reuters (2018); Franklin Strier & Donna Shestowsky, *Profiling the Profilers: A Study of the Trial Consulting Profession, Its Impact on Trial Justice and What, If Anything, to Do About It*, 1999 WIS. L. REV. 441, 444 (1999).

[86] 972 F.2d 1385 (5th Cir. 1992).

[87] *Id.* at 1398 & n.18.

[88] *Id.* at 1398 (footnote omitted).

[89] *Id.*

[90] *Id.*

selection."[91]  The court declined to turn over the polling material to the defendants until after trial and later denied their motion for a new trial.  The court held the poll had not undermined the integrity of the jury, noting none of the jurors who served on the jury had been contacted and the matter had been adequately covered in voir dire questioning.[92]

On appeal, the defendants challenged the survey under various theories.  The Fifth Circuit held the survey did not violate the defendants' due process rights in any respect.[93]  The appellate court agreed with the district court that complaints about the poll were a red herring.[94]  The court concluded that pretrial message testing did not give the government an unfair advantage at trial and no fundamental unfairness ensued from the district court's decision to withhold disclosing the polling materials to the defendants until after the trial.[95]  The court affirmed the convictions, holding, in relevant part, that the government's commencement of a telephone survey did not violate the defendants' due process rights.[96]

As *Collins* demonstrates, pretrial telephone surveys in the district from which the jury pool is drawn are not necessarily unfair or improper.  But when zealously pursued without fidelity to rules of professional ethics, community research activities—regardless of which side employs them—have the potential to taint the jury pool and threaten the functioning of the judicial system.

---

[91] *Id.*

[92] *Id.*

[93] *Id.* at 1398-99.

[94] *Id.* at 1398.

[95] *Id.* at 1399.

[96] *Id.* at 1415.

Concerns about undisclosed and unsupervised survey activities in the course of pending litigation are not unfounded, especially when a trial date is impending. Indeed, any type of community outreach—whether it be surveys, overt media engagement, or web-based activities—has the potential to impact the jury-selection process. A campaign of disinformation, in whatever form, undermines the sanctity of the judicial process and is inimical to the constitutional promise of a fair and impartial jury trial. It cannot be tolerated.

Lack of specific guidance on the form, content, and timing of community research in connection with pending litigation suggests such endeavors should be undertaken with great caution and a healthy dose of trepidation. When attitudinal research is conducted in the community from which the venire will be empaneled, they can present fertile ground for mischief and misadventure if adequate safeguards are lacking. A handful of federal courts in Texas have standing orders acknowledging that litigation focus testing is routinely employed but can impact the jury-selection process.[97] The standing orders do not *prohibit* use of surveys as a litigation tool; rather, they *regulate* the practice when it occurs in the county of suit.[98] Collectively, the orders (1) require pretrial notice of intent to conduct such a study; (2) require disclosure (to varying degrees) of the methodology; (3) temporally limit proximity to trial; and (4) require *in camera* submission of each participant's name and address in advance of the pre-trial conference. No such order was in place here.

---

[97] The Honorable Ron Clark, E.D.T.X. Standing Order RC-47 (Aug. 11, 2010); The Honorable Rodney Gilstrap and the Honorable Roy Payne, E.D.T.X. Standing Order Regarding Mock Juries (Feb. 3, 2012); The Honorable Robert Schroeder, E.D.T.X. Standing Order Regarding Mock Juries (Jan. 15, 2016); Kacy Miller, *A Primer on EDTX Jury Research Rules*, COURTROOMLOGIC CONSULTING (Mar. 2, 2017), http://courtroomlogic.com/2017/03/02/edtx-jury-research-rules/.

[98] *See supra* n.97.

Implementation of Brewer's survey in Lubbock County was not perforce impermissible, but it brought the survey's imperfections into sharper focus. Nevertheless, considering the survey process as a whole, we cannot agree the survey's ostensible shortcomings create a reasonable inference of bad faith. Evidence that the survey database and survey respondents were randomly selected—without any input by Brewer or his staff—was unrefuted. And the record does not support the allegation that anyone in particular was "targeted." Nor is there evidence that the size of the survey database suggested anything untoward. Genuine inaccuracies in the formulation of litigation statements tested in Brewer's quite lengthy survey are debatable, but any such defects were isolated and few and far between. The survey reflects reasonable efforts to achieve a reasonable degree of balance. Not perfect, but reasonable.[99]

The survey efforts bear other markers of good faith:

(1) *Qualified Third-Party Experts*.[100] Brewer engaged an independent, internationally recognized research organization to design and implement the survey.[101] As a member of the American Association for Public Opinion Research, Public Opinion Strategies was required to follow industry standards that include prohibiting push polls. Brewer and his firm were privy to the

---

[99] The parties present a false dichotomy between impermissible push polls and legitimate survey research. As the testimony of the movants' expert affirms, a survey could have aspects of both—neither all bad nor all good.

[100] *Cf. Tex. Aeronautics Comm'n v. Braniff Airways, Inc.*, 454 S.W.2d 199 (Tex. 1970) (qualifications of the researcher important in determining reliability of survey); *Baumholser v. Amax Coal Co.*, 630 F.2d 550, 552-53 (7th Cir. 1980) (a survey conducted by "qualified experts" in market research and public opinion helps provide "a substantial showing of reliability"); *Sanchez v. Cegavske*, 214 F. Supp. 3d 961, 970 (D. Nev. 2016) ("Generally, experts who design, conduct, and analyze a survey should have extensive training in the social sciences which includes methods, sampling, and statistics work."); *G. v. Hawaii, Dept. of Human Servs.*, 703 F. Supp. 2d 1112, 1125 (D. Haw. 2010) ("[T]he persons conducting the survey must be experts[.]") (quoting *Pitts. Press Club v. U.S*, 579 F.2d 751, 758 (3d Cir. 1978)).

[101] Public Opinion Strategies has been an industry-recognized research firm for more than twenty years, has conducted over 14,000 projects for scientific and political clients, and is headed by an individual with leadership positions in ethics organizations governing public opinion research internationally.

survey questions and had an opportunity to provide input, but were screened off from critical aspects by Public Opinion Strategies' use of third-party vendors to create the survey database and conduct the survey. This is consistent with industry practice and case law on pretrial surveying.[102] Barring red flags or other indicia of untrustworthiness—and the record here bears no evidence of either—one can reasonably presume qualified third-party research professionals will perform their services in accordance with industry standards.

(2) *Proper Relevant Universe and Randomly Drawn Representative Sample*.[103] In professional surveying research, the "relevant universe" refers to the universe of people most relevant to the issue being studied.[104] Defining the universe is a methodological choice designed to ensure a statistically significant result. Ordinarily, a prudent litigant might avoid the county of suit to avoid even the appearance of impropriety. But attitudinal studies conducted in other jurisdictions might not produce an appropriately representative sample or a statistically valid result.

Carter and Brewer reasonably explained why Lubbock County was chosen for the pretrial survey. The explosion, the moratoriums, the plaintiffs' own survey efforts, and enhanced media

---

[102] *Tunnell v. Ford Motor Co.*, 330 F. Supp. 2d 707, 719-20 (W.D. Va. 2004) (blind surveys are preferred as a method for avoiding bias where the interviewers and participants are "blind to the purpose and sponsorship of the survey" and "attorneys are excluded from any part in conducting interviews and tabulating results"); *Pitts. Press Club*, 579 F.2d at 758 (surveys should be conducted "independently of the attorneys" and "the interviewers," "[survey] designers," and "[survey] Respondents" should all be "unaware of the purposes of the survey or litigation").

[103] *County of Kenosha v. C&S Mgmt., Inc.*, 588 N.W.2d 236, 253 (Wis. 1999) (examining relevant population); *Nat'l Football League Props., Inc. v. N.J. Giants, Inc.*, 637 F. Supp. 507, 513-14 (D.N.J. 1986) (analysis of survey began with universe selected for the survey conducted).

[104] For example, in trademark litigation, the relevant universe would be people in the market who would purchase a product and be exposed to and confused by the competing product. *See, e.g.*, *Nat'l Football League Props.*, 637 F. Supp. at 514 (survey properly conducted in a community of concentrated support for the Giants). In change of venue cases, the relevant universe would be the community the party believes has been tainted or prejudiced in some way. *See, e.g.*, *U.S. v. Rodriguez*, 581 F.3d 775, 785 (8th Cir. 2009) (discussing several cases where public opinion polls were introduced in change-of-venue motions based on community prejudice).

34

coverage took place in Lubbock County. Carter also explained that other jurisdictions may not be as prone to significant lightning events as Lubbock County. Brewer and Carter provided specific reasons why Lubbock County residents were uniquely situated to properly evaluate the impact of media coverage on public opinion and test themes and messages that would resonate with the relevant community. The record bears no evidence these reasons were false or otherwise pretextual.

As to sample size, no one has asserted that completing 300 surveys or assembling a survey database of 20,000 was abnormal or improper.[105] A representative sample is required to ensure research results are not skewed, and the results here show a statistically acceptable margin of error. While significantly overdrawing from a sample could suggest improper motives for conducting a survey, there is no evidence that occurred here.

(3) *Adherence To Generally Accepted Standards*. The record lacks evidence that the sample, questionnaire, and interviews were designed without adhering to generally accepted standards of objective procedure and statistics in the research field. Brewer's firm was not entirely hands off in formulating the survey questions, but Carter's input was limited and Brewer's was minimal, and neither participated in the survey administration process.[106] The trial court observed that Brewer was the customer who told the retailer what to do. But by engaging a third-party professional to design and implement the survey, the retailer was subject to and constrained by professional guidelines and ethical standards. The American Association for Public Opinion Research, the European Society

---

[105] *See U.S. v. Collins*, 972 F.2d 1385 (5th Cir. 1992) (finding no adverse jury impact arising from a telephone survey of 457 local respondents in connection with a high-profile criminal trial).

[106] *See Pitts. Press Club*, 579 F.2d at 758 ("[T]he survey must be conducted independently of the attorneys involved in the litigation."); *G. v. Hawaii, Dept. of Human Servs.*, 703 F. Supp. 2d 1112, 1125 (D. Haw. 2010) (same); *Sanchez*, 214 F. Supp. 3d at 970 (articulating the reasons behind preference for attorneys and firms to remain separate from the survey administration process).

for Opinion Marketing and Research, other organizations, and watchdog groups regularly publish these guidelines.[107]  Absent evidence to the contrary, reputable researchers, like Public Opinion Strategies, can reasonably be expected to adhere to these guidelines to maintain membership in professional associations and to maintain credibility.

(4) *Randomized Favorable and Unfavorable Message-Testing Questions*.  In several important respects, Brewer's survey resembles the survey in *United States v. Collins*—similarities included survey size, situs, and message testing based on the surveyor's point of view.  But where those surveys differ is even more notable.  Unlike the *Collins* survey, Brewer's survey included a relatively balanced array of statements that favored and undermined his client's litigation position.  The survey did not endorse either set of statements or represent them to be facts; it merely asked respondents if the statements—whether favorable or unfavorable—were convincing.  And most of the message-testing questions were rotated to avoid order bias.  Rotating questions is common in professional public opinion research as a way to ensure unbiased results.  This strategic choice indicates an intent to solicit the respondent's opinions rather than shape them.

On the other hand, (1) not all the adverse statements against other potentially responsible parties were rotated, (2) some of the negative statements about Brewer's clients were not as strongly negative as negative statements about other parties and non-parties, (3) emphasis was used only in a single question and that question was favorable to Titeflex, and (4) not all negative messages were counterbalanced.  For example, in various forms or fashions, the survey made reference to improper installation of the piping at least thirteen times but included only one question suggesting CSST

---

[107] *See, e.g.*, *AAPOR Code of Ethics*, AMERICAN ASSOCIATION FOR PUBLIC OPINION RESEARCH (revised Nov. 2015), https://www.aapor.org/Standards-Ethics/AAPOR-Code-of-Ethics.aspx.

piping could fail even if properly installed.  But in determining whether the survey was designed in bad faith, it should be viewed holistically, not by isolating its parts.  And, here, the whole is greater than the sum of its parts.

On the record before the court, the trial court's finding that Brewer designed and implemented the survey in bad faith is unsupported.  Even if some of the survey questions were individually problematic, bad faith cannot be inferred merely from error;[108] otherwise, it would cease to function as a constraint on sanction power.[109]  Nor can conscious wrongdoing be inferred merely from the fact that a message-testing survey was conducted proximate to trial without voluntary disclosure when, unlike *In re Bennett*, no governing authority expressly or implicitly regulated those aspects of the survey efforts.[110]  Improper motive might be reasonably inferred if the record bore even slight evidence that SSI's contacts with case-related individuals could not have occurred randomly; or if Brewer engaged in a pattern or practice of similar conduct; or if the background materials Carter provided to the survey company were so one-sided or unbalanced as to taint the independence of the survey process; or if there were proof demonstrating pervasive falsity, rather

---

[108] *McWhorter v. Sheller*, 993 S.W.2d 781, 789 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (reversing sanctions imposed on attorney who taped telephone conversation with the court and opposing counsel, holding conduct showed "at best, some degree of inexperience and negligence [but not] an intentional act made in bad faith").

[109] *Kutch v. Del Mar Coll.*, 831 S.W.2d 506, 510 (Tex. App.—Corpus Christi 1992, no writ) ("The amorphous nature of this power, and its potency, demands sparing use.").

[110] *Collins*, 972 F.2d at 1400 n.27 (government-commissioned community attitudes survey was not subject to mandatory *Brady* disclosure because neither the poll nor its results were "evidence"); *Primrose Operating Co., Inc. v. Jones*, 102 S.W.3d 188, 192 (Tex. App.—Amarillo 2003, pet. denied) (mock trial was conducted four days before case was called for trial).

than incidental errors and statements based on disputed evidence. But inference stacked only on other inferences is not sufficient to support a finding of bad faith.[111]

## 2. Courtroom Demeanor

The trial court's letter ruling negatively references Brewer's behavior at the sanctions hearing in the following respects: (1) his "nonchalant and uncaring" demeanor, (2) "repeatedly evasive" answers to questions, which resulted in the court "sustain[ing] multiple objections for non-responsiveness," and (3) his intransigence in defending himself on the basis that he acted reasonably in hiring a third-party vendor to conduct a blind study. From this, the respondents infer the trial court sanctioned Brewer not only because of the survey but also based on his courtroom conduct, and they suggest the sanctions order can be upheld on that basis alone. Even if the former is correct, the latter is not.

Trial courts are empowered to command respect and decorum in courtroom proceedings and may exercise that authority by sanctioning members of the bar who are pugnacious and indecorous.[112] Attorneys are expected to comport themselves respectfully and professionally in their interactions with the court, opposing counsel, the parties, and witnesses. Failure to do so can disrupt proceedings, impair the efficient administration of justice, and impede the exercise of a trial court's core functions.[113] But the record here does not reflect that Brewer's behavior interfered with the

---

[111] *See Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 728 (Tex. 2003).

[112] *See Chambers v. NASCO, Inc*., 501 U.S. 32, 43 (1991).

[113] *See Armadillo Bail Bonds v. State*, 802 S.W.2d 237, 239 (Tex. Cr. App. 1990) (core judicial functions include hearing evidence, deciding issues of law or fact, and rendering final judgments); *accord McWhorter v. Sheller*, 993 S.W.2d 781, 788-89 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

administration of justice, detracted from the trial court's dignity and integrity, or even prolonged the hearing to any measurable degree.

Over the course of an entire day of questioning, the trial court sustained only four objections to Brewer's testimony on the basis of nonresponsiveness. In response to a fifth objection, the court instructed him to listen and answer the question asked. And at a break, the court asked Brewer's counsel to "please visit with [his] client about answering the question that's asked." After the court's mild rebuke, Brewer toed the line, and the court sustained no further responsiveness objections to his testimony.

Failure to appreciate the gravity of the matter, by displaying a "nonchalant and uncaring" demeanor, might bear on the type of sanction necessary to deter, punish, or secure compliance. But the record does not reflect that Brewer engaged in the type of contumacious, insolent, or disrespectful behavior that rises to the level of sanctionable conduct in its own right.

Making groundless arguments in bad faith or for an improper purpose might warrant sanctions, but arguments that are merely "unpersuasive" do not. Brewer's defensive theories were not so meritless that they could properly be characterized as "bad faith, unprofessional and unethical."

In sum, whether viewed separately or cumulatively, we hold that the sanctions order is not sustainable based solely on Brewer's attitude or courtroom behavior.

### III. Conclusion

The survey Brewer commissioned was not a model of perfection, and its execution was not flawless. Nearly everyone agrees, including Brewer, that he should have ensured the survey database excluded witnesses, parties, and governmental officials directly connected with the litigation. But these errors do not constitute bad faith when the survey and the circumstances of its undertaking are viewed in totality. Brewer's dismissive attitude and intermittent obstinance at the sanctions hearing undoubtedly taxed the trial court's patience and was relevant to what sanctions should be imposed but did not itself justify the imposition of sanctions. We therefore reverse the court of appeals' judgment and vacate the sanctions order.

_____
Eva M. Guzman
Justice

**OPINION DELIVERED**: April 24, 2020

LUBBOCK, TEXAS
*Interview Schedule*

Field Dates: May 21-22, 2014
Project#: 14381

N=300 Homeowners
Margin of Error = ±5.66%

Hello, I'm _____ of _____ Research, a national research firm. We're talking with people in your area and would like to ask you a few questions on a confidential basis. We are not attempting to sell anything, nor will your participation result in any calls in the future to sell you anything. **(DO NOT PAUSE)**

**(ASK CP1-CP4 QUESTIONS TO CELL SAMPLE ONLY)**

CP1.    For your safety, are you currently driving?

CP2.    In which state do you currently live? **(If not TEXAS THANK AND TERMINATE)**

CP4.    Of all the personal telephone calls that you receive, do you get... **(READ, ROTATE PUNCHES 1 AND 3 - KEEP 2 ALWAYS IN THE MIDDLE)?**

First, just a few questions about you to make sure we have a representative sample . . . .

A.    And, do you own or rent your home?

   **(IF OWN, ASK:)** And, do you want to move sometime in the next few years?

B.    And, just to be sure we have a representative sample . . .

   In what year were you born?

1.    Would you say that things in Lubbock are going in the right direction... or have they pretty seriously gotten off on the wrong track?

Thinking about a different topic.

How likely is it that any of the following weather related events would damage homes in your area? **(RANDOMIZE)**

|  | VERY LIKELY | SMWT LIKELY | NOT VERY LIKELY | NOT AT ALL LIKELY | DK (DNR) | REF (DNR) |
|---|---|---|---|---|---|---|
| 2  Tornado |  |  |  |  |  |  |
| 3  Flood |  |  |  |  |  |  |
| 4  Lightning |  |  |  |  |  |  |

5. Thinking now just about lightning, if lightning were to actually strike your home, would the damage to that home be (ROTATE TOP TO BOTTOM, BOTTOM TO TOP) . . .

VERY SIGNIFICANT
SOMEWHAT SIGNIFICANT
NOT VERY SIGNIFICANT
NOT AT ALL SIGNIFICANT

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

TOTAL SIGNIFICANT
TOTAL NOT SIGNIFICANT

6. Thinking some more about your house, who would you say is MOST responsible for ensuring that your home is safely constructed. Is it . . . (RANDOMIZE)

THE HOME BUILDER
MANUFACTURERS OF THE BUILDING MATERIALS IN THE HOME
HOME INSPECTORS
HOMEOWNER

OTHER (SPECIFY _____ )
ALL OF THE ABOVE

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

7. Thinking now about your home, do you use natural gas in your home?

YES, USE NATURAL GAS
NO, DO NOT USE NATURAL GAS

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

(IF Q7:1, ASK)
8. And, is the natural gas in your home transported by Corrugated Stainless Steel Tubing, also known as CSST, or is it transported by black iron pipe?

CSST
Black iron pipe

Other (SPECIFY) (_____ )
Neither (DO NOT READ)

Don't Know/Not Sure (DO NOT READ)
Refused (DO NOT READ)

Changing topics slightly . . .

9. As you may know, a lightning strike can damage materials in your home, including the CSST used to transport natural gas. In some instances where the CSST is not installed in accordance with the manufacturer's instructions, damage to CSST following a lighting [sic] strike can result in the escape of natural gas, which can cause a house fire. If this happened at your home, who would you say is MOST to blame? (RANDOMIZE)

The manufacturer who makes and sells the natural gas piping
The installer, who might have installed the material improperly
The homebuilder, who hires the installers of the natural gas piping
No one, because a lightning strike is a natural disaster

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

TOTAL INSTALLER/HOMEBUILDER

10. And, have you seen, read, or heard anything about the potential dangers of CSST?

YES
NO

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

(If Q10:1, ASK)
11. And, what was the source of this information? (DO NOT READ) (ACCEPT MULTIPLE RESPONSES)

TV
RADIO
MAIL
NEWSPAPER
FRIENDS/NEIGHBORS/FAMILY
INTERNET/E-MAIL

OTHER (Specify: _____ )
DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

12. And, have you seen, read, or heard anything recently about lightning striking a home in Lubbock in August 2012, resulting in a house fire that killed a man who was visiting the home at the time?

YES
NO

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

(If Q12:1, ASK)
13. And, what was the source of this information? (DO NOT READ) (ACCEPT MULTIPLE RESPONSES)

TV
RADIO
MAIL
NEWSPAPER
FRIENDS/NEIGHBORS/FAMILY
INTERNET/E-MAIL

OTHER (Specify _____ )
DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

14. As you may know, in August of 2012, lightning struck a home in Lubbock during a thunderstorm the lightning caused a fire that killed a man who was visiting the home at the time. Fire officials ruled that the fire was caused by a type of natural gas piping called Corrugated Stainless Steel Tubing, or CSST. I would like to read you two statements about who should be responsible for the fire. After I read each one, please tell me which comes closest to your own opinion.

(SOME/OTHER) People say that the homebuilder who built the house should be responsible for the incident. They say that if the CSST had been properly installed, it would not have been damaged during the lightning strike, and thus, no fire would have occurred. They say the homebuilder or installer did not make sure that there was a reasonable amount of space between the piping and other electrical wires, as is called for in the manufacturer's installation guidelines. They say that even if the CSST suffered damage which allowed gas to escape, it is unfair for the manufacturer of a product to be held responsible for the improper installation of that product.

. . . while . . .

(OTHER/SOME) People say that the manufacturer of the CSST should be responsible for what happened and should not be selling CSST if there is any chance it might fail in a lightning strike. They say the company should not be selling that product, particularly if it knows there is a likelihood it might fail if not properly installed. The ultimate responsibility for product safety rests with a manufacturer.

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

15. As a result of the fire, the homeowners have filed a lawsuit. I am going to read you four options of who the homeowners should sue. After I read each one, please tell me which comes closest to your own opinion. (RANDOMIZE)

The homeowners should sue the homebuilder but NOT the manufacturer of the CSST.
The homeowners should sue the manufacturer of the CSST but NOT the homebuilder.
The homeowners should sue BOTH the homebuilder AND the manufacturer of the CSST.
The homeowners should not be suing anyone.

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

(IF Q15:1-4, ASK)
16. And what are some of the reasons you think that (INSERT Q15 CHOICE)? (PROBE:) What else can you tell me about that? Anything else?

44

(ROTATE Q17-25 AND Q26-33)

Now I am going to read you several statements about why the manufacturer of the corrugated stainless steel tubing, also known as CSST SHOULD NOT be held responsible. After I read each one, please tell me how convincing that statement is to you. Is it . . . very convincing, somewhat convincing, not very convincing, or not at all convincing? (RANDOMIZE)

17    CSST is approved by the American Gas Association and has been on the market since 1990. CSST is installed in millions of homes across the nation and more than 600,000 homes in Texas, but this is the first time this manufacturer has ever been sued in a wrongful death case

18    There are clear warnings on the packaging of CSST that, in order to be safe in a lightning storm, the piping must be installed according to the manufacturer's Design & Installation Guide. It is not the fault of the manufacturer that these warnings were not followed in this instance.

19    The manufacturer of CSST partners with the National Association of State Fire Marshals on an awareness campaign about this type of piping that helps make sure people know if they have the product in their home and to see if it was properly installed.

20    The homebuilder did a sloppy job of supervising the contractor he hired to install the electrical wiring and the electrician did not allow for a reasonable amount of space between the electrical wiring and the CSST. The manufacturer cannot be held responsible for this type of sloppy and careless oversight.

21    CSST was developed as a safer alternative to black iron pipe. It has fewer joints, which means there are less places where it can potentially leak. It is also flexible and able to withstand earthquakes or foundation shifts.

22    Many states recognize that CSST is very safe. For example, after a thorough scientific-investigation, the state of Massachusetts lifted a ban on CSST.

23    The Texas State Fire Marshall has said he has no doubt that CSST is safer when it is properly installed.

24    No court has EVER ruled that CSST has been responsible for a fire when it is properly installed.

25    There were many other things that contributed to this tragic incident. The foam insulation in the attic was not properly treated, the people who were present did not heed the warnings of the smoke alarm, and electrical wiring was laying right on top of the CSST, which is in violation of the safety warnings and installation guidelines.

Now I am going to read you several statements about why the manufacturer of the corrugated stainless steel tubing, also known as CSST SHOULD be held responsible for causing the fire. After I read each one, please tell me how convincing that statement is to you. Is it . . . very convincing, somewhat convincing, not very convincing, or not at all convincing? (RANDOMIZE)

26    The manufacturer of CSST has settled hundreds of lawsuits with insurance companies involving the product and lightning fires.

27    Since the 2012 fire and death, the Lubbock Fire Marshal has banned the use of CSST in new home construction.

28    The manufacturer of CSST makes another gas piping product that it promotes as "lightning resistant." Since it makes a product that may be safer, the manufacturer should not be selling the older, less safe version of the product.

45

29. Texas and more than a dozen other states are identified by the manufacturers as being lighting-prone [sic]. Clearly, the manufacturer should not sell CSST in those states.

30. If the manufacturer is aware that some installers are not installing CSST properly and CSST has the potential to fail in lighting [sic] storms, it should not sell the product in the first place.

31. The manufacturer has a responsibility to ensure CSST is being installed safely. It is not enough to simply entrust that responsibility to the home builder or installer.

32. The manufacturer of CSST has set aside more than one hundred million dollars to fund litigation and settle lawsuits stemming from this product.

33. One of this manufacturer's main competitors quit selling CSST in the United States because the product is unsafe and prone to failure.

---

Now that you have heard some more about this issue . . .

34. I am going to again read you four options of who the homeowners should sue. After I read each one, please tell me which comes closest to your own opinion. (RANDOMIZE)

The homeowners should sue the homebuilder but NOT the manufacturer of the CSST.
The homeowners should sue the manufacturer of the CSST but NOT the homebuilder.
The homeowners should sue BOTH the homebuilder AND the manufacturer of the CSST.
The homeowners should not be suing anyone.

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

---

35. And, when lightning hits a house and damages the natural gas piping, causing it to leak gas and resulting in a fire . . . who would you say is most at fault. (ROTATE)

The manufacturer who makes and sells the CSST
The homebuilder who oversees the installation of the CSST
. . or . .
Neither, because a lightning strike is a natural disaster
The installer, who might have installed the material improperly (UNREAD OPTION IN Q35)

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

---

Now I just have a few more questions for statistical purposes only . . .

36. And what is the last grade you completed in school? (DO NOT READ)

SOME GRADE SCHOOL (GRADES 1-8)
SOME HIGH SCHOOL (GRADES 9-11)
GRADUATED HIGH SCHOOL (GRADE 12)
TECHNICAL/VOCATIONAL SCHOOL
SOME COLLEGE
GRADUATED COLLEGE
GRADUATE/PROFESSIONAL SCHOOL

REFUSED

46

HIGH SCHOOL OR LESS
SOME COLLEGE
COLLEGE+

37. And in politics today, do you consider yourself ... (ROTATE)

a Republican,
a Democrat,
or something else?

. . . or are you not registered to vote?

(IF REPUBLICAN OR DEMOCRAT, ASK:) Would you call yourself a STRONG
(REPUBLICAN/DEMOCRAT) or a NOT-SO-STRONG (REPUBLICAN/DEMOCRAT)?

(IF SOMETHING ELSE, ASK:) Do you think of yourself as closer to the Republican or to the Democratic
party?

STRONG REPUBLICAN
NOT-SO-STRONG REPUBLICAN
LEAN TO REPUBLICANS

SOMETHING ELSE/INDEPENDENT

LEAN TO DEMOCRATS
NOT-SO-STRONG DEMOCRAT
STRONG DEMOCRAT

NOT REGISTERED TO VOTE

DON'T KNOW (DO NOT READ)
REFUSED (DO NOT READ)

TOTAL REPUBLICAN
TOTAL DEMOCRAT

38. And for statistical purposes only ... is your total annual household income greater or less than
$60,000 dollars?

UNDER $20,000
BETWEEN $20,000 - $40,000
OVER $40,000

UNDER $60,000
BETWEEN $60,000 - $100,000
OVER $100,000

REFUSED

UNDER $40K
$40K - $80K
OVER $80K

39. And, how long have you lived in Lubbock? **(DO NOT READ CHOICES)**

LESS THAN TWO YEARS
TWO TO FIVE YEARS
FIVE TO TEN YEARS
TEN TO TWENTY YEARS
MORE THAN TWENTY YEARS
NATIVE

DON'T KNOW **(DO NOT READ)**
REFUSED **(DO NOT READ)**

40. And, how long have you been a homeowner? **(IF MORE OWNED MORE THAN ONE HOUSE, ASK FOR TOTAL LENGTH OF HOMEOWNERSHIP) (DO NOT READ CHOICES)**

LESS THAN TWO YEARS
TWO TO FIVE YEARS
FIVE TO TEN YEARS
TEN TO TWENTY YEARS
MORE THAN TWENTY YEARS

DON'T KNOW **(DO NOT READ)**
REFUSED **(DO NOT READ)**

41 What is your main racial or ethnic origin? Is it **(READ CHOICES — ACCEPT ONLY ONE RESPONSE)**

WHITE
BLACK OR AFRICAN AMERICAN
ASIAN
... or ...
HISPANIC

SOMETHING ELSE (Specify: _____) **(DO NOT READ)**
REFUSED **(DO NOT READ)**

42. Gender **(BY OBSERVATION)**

MALE
FEMALE